IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 19-cv-00167-RBJ

THE ESTATE OF BRIAN HEATH ROUNDTREE, by and through its personal representative
Dennis Roundtree;
H.R., a minor, by and through mother and next friend Nicole Roundtree;
C.R., a minor, by and through mother and next friend Tricia Baker;
B.R., a minor, by and through mother and next friend Tricia Baker; and
O.S., a minor, by and through mother and next friend Sarah Schultz,

       Plaintiffs,

v.

CORRECT CARE SOLUTIONS, LLC; and
SHAUNDIVA GARRETT, individually,

       Defendants.

---

ORDER ON DEFENDANT GARRETT'S PARTIAL MOTION FOR SUMMARY
JUDGMENT

---

The matter is before the Court on defendant Garrett's partial motion for summary

judgment, ECF No. 83.  For the below reasons, defendant's motion is DENIED.

## I. FACTUAL BACKGROUND

The following facts are not in dispute.  This case involves the suicide of Mr. Roundtree, a

43-year-old inmate in the Arapahoe County Detention Facility ("ACDF"), who killed himself

hours after defendant Garrett released him from suicide watch.  Defendant Garrett was a Correct

Care Solutions ("CCS") employee at the time she released Mr. Roundtree from suicide watch.

Plaintiffs, Mr. Roundtree's family members, assert the following claims against defendants: wrongful death and denial of medical care in violation of U.S.C. § 1983.  ECF No. 1 at 20, 22.

Mr. Roundtree was arrested on January 17, 2018 for a string of robberies he committed in December 2017.  ECF No. 83 at 5.  Arapahoe County Investigator Steveny True interviewed Mr. Roundtree for a couple of hours following his arrest.  ECF No. 87-6 at 20:7–11.  During the course of that interview Mr.  Roundtree confessed to committing nearly twenty armed robberies across the Front Range within a three-week span.  ECF No. 87-7 at 5:18-21.  Throughout this hours-long interview, Investigator True became increasingly concerned that Mr. Roundtree may try to harm himself if left unattended.  She recalls that while Mr. Roundtree did not explicitly state that he wanted to commit suicide, he made numerous suicidal innuendoes.  *Id*.  Investigator True stated that Mr. Roundtree "did not say suicide by cop, but that was kind of the projection that I got out of him . . .  And I remember him saying something that he wouldn't want to put a deputy through that.  And definitely statements that were definitely a reason to put someone on watch."  *Id*. at 25: 5-9.

Investigator True also noted other aspects about Mr. Roundtree's demeanor during the interview that made her concerned about his potential suicidality.  According to Investigator True, "the way he [confessed] was another alarming factor.  We have people all the time that will come in and confess to everything, but the way he did it, it was—it was a little bit of more than just a confession.  It was kind of—in my opinion, again—just like, there's nothing to live for . . . ."  ECF No. 87-6 at 25:18–26:1.  Following Investigator True's interview of Mr. Roundtree, she directed Deputy Hallett to place him on suicide watch.  ECF No. 87-6 at 23:18–24:13.

Deputy Hallett transported Mr. Roundtree to ACDF and told the intake deputy that Mr. Roundtree should be placed on suicide watch. ECF No. 83-4 at 23. Accordingly, Mr. Roundtree was placed on suicide watch in the booking area when he first arrived. Jail staff completed a suicide watch observation log that recorded Mr. Roundtree's actions every fifteen minutes. The log lists the reason for Mr. Roundtree's placement on suicide watch as his "want[ing] to die suicide by cop." ECF No. 87-16 at 1. However, in her deposition Investigator True states that Mr. Roundtree never explicitly made this statement but "that was kind of the projection [she] got out of him saying that—you know, he could go out like that." ECF No. 87-6 at 25:5–9. Whether Mr. Roundtree made this statement or not, the intake officer understood him to have made it, and the alleged statement was the basis for placing Mr. Roundtree on suicide watch. ECF No. 87-16 at 1–2.

Soon after Mr. Roundtree arrived at the jail, Nurse Baisden conducted a pre-brook screening of him. *See* ECF No. 87-17. The screening noted that Mr. Roundtree experienced recent trauma in October 2017 when he broke his skull and facial bones. It further stated that he had experienced "divorce or the loss of a long-term intimate relationship within the past three months." *Id.* at 1.

Defendant Shaundiva Garrett, a CCS employee, worked at ACDF as a licensed professional counselor and conducted Mr. Roundtree's suicide watch assessment. Ms. Garrett was trained to use the Columbia Suicide Severity Rating Scale ("Columbia Scale") when conducting such assessments. ECF Nos. 87-3 at 46:9-13; 83-6 at 2. The Columbia Scale requires mental health professionals to consider various risk factors that have been associated with increased suicidality. Examples of risk factors include: "actual suicide attempt[s]",

"wish[ing] to be dead," "suicidal thoughts," "suicidal intent with specific plan," "recent loss or other significant negative event," "pending incarceration or homelessness," "previous psychiatric diagnoses or treatment," "noncompliance with treatment," "hopelessness," "helplessness," "major depressive episodes," "highly impulsive beahvior," "substance abuse and dependence," and "being a perceived burden on family members or others."  ECF No. 87-11 at 3.  In addition to considering these risk factors, the mental health professional asks numerous questions to better understand the individual's mental state and life circumstances.  Each question must be asked twice and posed within two different timeframes.  ECF No. 87-11 at 4.  For example, the mental health professional will ask whether the individual has actively attempted to commit suicide within the past three months, and whether the individual has ever actively attempted suicide within his or her lifetime.  ECF No. 87-11 at 5.

On the morning of January 18, 2018 Ms. Garrett approached the holding cell where Mr. Roundtree was sleeping.  Ms. Garrett woke him up and proceeded to conduct the assessment. Mr. Roundtree reported that he had not wished to be dead in the month prior to his arrest.  ECF No. 87-21 at 1.  He further stated that he had not experienced any suicidal thoughts in the past month.  *Id.*  He did however admit that he previously tried to commit suicide in October 2017, approximately three-and-a-half months prior to his arrest, when he drove a car at sixty miles per hour into a parked car.  Following this attempt Mr. Roundtree was hospitalized in the ICU for five days.  He suffered serious injuries including a fractured skull and broken facial bones.  ECF No. 87-21 at 2.

The suicide watch assessment form that Ms. Garrett completed required her to note Mr. Roundtree's risk factors, i.e. those that made him more likely to be suicidal, and protective

4

factors, i.e. those weighing against suicidality.  Ms. Garrett identified Mr. Roundtree's prior

suicide attempt as his only risk factor, and she marked his ability to identify a reason for living as

his only protective factor.  Notably, Ms. Garrett did not consider the following risk factors to

apply to Mr. Roundtree: impulsiveness, history of major depressive or manic episodes, or new

legal issues such as new criminal charges.  ECF No. 87-21 at 4.  Additionally, despite Mr.

Roundtree's admitting that he had not been taking his prescribed antidepressant, Ms. Garrett

checked "not applicable" to the section of the assessment form that asked whether the inmate

was "medication compliant."  ECF No. 87-21 at 3.  Ms. Garrett's assessment of Mr. Roundtree

lasted approximately five-and-a-half minutes.  *See* ECF No. 89.  Following the assessment, Ms.

Garrett recommended that Mr. Roundtree be removed from suicide watch and placed in general

population.

On the morning of January 18, 2018—a couple of hours after Ms. Garrett's assessment—

Mr. Roundtree appeared at his advisement on his new burglary charges in the Arapahoe County

District Court before the Hon. Eric White.  Deputy District Attorney Clinton McKinzie

represented the government.  ECF No. 87-7.  Mr. McKenzie stated that Mr. Roundtree

> told police last night that he was essentially a danger to himself.  That he—that they are
> lucky they took him into custody the way they did, otherwise it would have been suicide
> by cop.  He has been on suicide watch this morning out of concern not only for the
> community's safety, but on concern for Mr. Roundtree's safety.

*Id.* at 5:8-15.  The judge increased bond to one million dollars cash or surety.  *Id.* at 8:8-10.  In

reaching his decision the judge stated

> I am concerned regarding the safety of the community, the likelihood of conviction based
> upon the record made by Mr. McKinzie, and candidly, the safety of this Defendant.  And
> although that certainly sounds counterintuitive every time I say it from here to keep
> somebody in jail, the jail is the best place for me to ensure this Defendant does not harm
> himself.

Id. at 8:1–7.  The hearing concluded at 11:33 on the morning of January 18, 2018.

Following the advisement hearing, Mr. Roundtree was escorted back to ACDF. Consistent with defendant Garrett's recommendation that Mr. Roundtree be removed from suicide watch, he was taken off suicide watch and assigned to a cell that contained a bunk bed and normal bedding.  At 9:50 pm an emergency alarm sounded, and officers responded to Mr. Roundtree's pod.  Officers found Mr. Roundtree hanging and lifeless in his cell.  Mr. Roundtree was pronounced dead at 10:08 pm on January 18, 2018.  ECF No. 83-5 at 21.

## II. PROCEDURAL BACKGROUND

Plaintiffs filed their complaint on January 18, 2019 against CCS; the Board of County Commissioners for the County of Arapahoe; Shaundiva Garrett, a CCS employee providing mental health services in ACDF; Brandon Dugan, a nurse at ACDF; and Tyler Brown, the Arapahoe County sheriff.  ECF No. 1.  On March 2, 2020 the parties filed a joint motion to dismiss defendant Dugan as a party to this lawsuit.  ECF No. 76.  The Court granted that motion on the same day.  ECF No. 77.  Defendant Brown settled this matter with plaintiffs.  ECF No. 92. On October 10, 2020 the parties filed a stipulation of voluntary dismissal and dismissed The Board of County Commissioners as a defendant.  ECF No. 110.  As a result, the Arapahoe County defendants were dismissed from this lawsuit, and the negligence-in-the-operation-of-a-jail claim—brought only against the county defendants—was also dismissed at that time.  *See* ECF No. 1 at 25.  As of the date of this order, the only remaining defendants are CCS and Garrett.  On May 6, 2020 defendant Garrett filed a motion for partial summary judgment.  ECF No. 83.  On May 27, 2020 plaintiffs filed their response.  ECF No. 87.  On June 12, 2020 Garrett filed her reply.  ECF No. 95.  The matter is ripe for review.

## III. STANDARD OF REVIEW

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The Court will examine the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Concrete Works of Colo., Inc. v. City and Cty of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

## IV. ANALYSIS

Defendant Garrett moves for partial summary judgment as to plaintiff's deliberate indifference claim. According to Ms. Garrett, summary judgment is appropriate for two reasons. First, she argues that the undisputed facts illustrate that no constitutional deprivation occurred. ECF No. 83 at 2. Second, she contends that she is entitled to qualified immunity. *Id.* I begin by analyzing the issue of qualified immunity.[1]

---

[1] The Court notes that whether someone can be sued under 42 U.S.C. § 1983 for "acting under color of state law," and whether someone is entitled to raise the defense of qualified immunity are two distinct inquiries. In *West v. Atkins*, the Supreme Court held that a private physician's providing medical treatment in a state prison "was state action fairly attributable to the State, and that [the physician] acted under the color of state law for purposes of § 1983." 487 U.S. 42, 57 (1988). Thus, Defendant Garrett acted under color of state law when she provided mental health care to Mr. Roundtree at ACDF.

**A. <u>Whether defendant Garrett is qualifiedly immune from liability</u>**

Qualified immunity protects government officials acting in their individual capacities so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting Harlow *v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Defendant Garrett argues she is entitled to qualified immunity because "a government contractor can assert the defense of qualified immunity despite not being a government employee." ECF No. 83 at 18. Plaintiffs argue that Garrett is not entitled to qualified immunity because she was a CCS employee, not a public official.

Determining whether an official is entitled to qualified immunity is typically a two-step inquiry. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). The Court must ask (1) whether plaintiff has sufficiently demonstrated that a constitutional violation occurred, and (2) whether the constitutional right at issue was clearly established at the time of the incident. *Pearson*, 555 U.S. at 232. However, the Court must determine whether a privately employed defendant may raise qualified immunity, a protection traditionally reserved for government officials.

Section 1983 "creates a species of tort liability that on its face admits of no immunities." *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976). However, courts have long recognized certain immunities to Section 1983 lawsuits in contexts where a "tradition of immunity was so firmly rooted in the common law and was supported by such strong policy reasons that 'Congress would have specifically so provided had it wished to abolish the doctrine.'" *Wyatt v. Cole*, 504 U.S. 158, 164 (1992) (quoting *Owen v. City of Independence*, 445 U.S. 622, 637 (1980)).

Although qualified immunity is a well-recognized principle in the Section 1983 context, its applicability becomes less clear when the party who asserts it is not a public official but instead a private individual who provides services on behalf of the government.

In *Richardson v. McKnight*, the Supreme Court considered whether private prison guards were entitled to qualified immunity. The *Richardson* Court held that when determining whether private defendants enjoy immunity, courts must look to both history and the "special policy concerns involved in suing government officials." *Richardson v. McKnight*, 521 U.S. 399, 404 (1997). The *Richardson* Court further held that private prison guards were not entitled to qualified immunity because "history does not reveal a firmly rooted tradition of immunity applicable to privately employed prison guards.'" *Id.* (internal quotation marks omitted). However, the Supreme Court made clear that its holding in *Richardson* was narrow in scope and limited to the facts before it. *Id.* at 413 (explaining that the Court "ha[s] answered the immunity question narrowly, in the context in which it arose."). Thus, *Richardson* does not preclude *all* private individuals who provide services in prisons from raising the defense of qualified immunity. Instead, the thrust of *Richardson* is its direction to consider the history and policy rationales underlying qualified immunity when determining whether to extend it to private actors. Courts addressing this issue should consider the three primary policy rationales for qualified immunity: (1) "protecting the public from unwarranted timidity on the part of public officials," (2) "ensur[ing] that talented candidates are not deterred by the threat of damages suits from entering public service," and (3) guarding against the distraction of litigation. *Id.* at 408.

In dicta the *Richardson* court stated that historically "the law did provide a kind of immunity for certain private defendants, such as doctors or lawyers who performed services at

the behest of the sovereign." *Id*. at 408.  This statement has created a circuit split as to whether private healthcare providers, performing services on behalf of the state, are entitled to qualified immunity.  Notwithstanding the Supreme Court's dicta in *Richardson*, however, the majority of circuits have held that private healthcare professionals are not entitled to the defense of qualified immunity.

The Tenth Circuit has not expressly addressed this question.  In *Kellum v. Mares*, the Tenth Circuit avoided deciding the issue altogether.  657 F. App'x 763, n. 6 (10th Cir. 2016) (unpublished) (explaining that "this court has yet to decide whether or not qualified immunity is available to employees of a private company providing medical services to inmates.").  However numerous other circuits and courts, including this district, have held that historical considerations and policy rationales do *not* support extending qualified immunity to private healthcare providers.

In *McCullum v. Tepe*, a case brought against a privately employed prison psychiatrist, the Sixth Circuit held that the psychiatrist could not raise qualified immunity.  It reasoned that "[t]here does not seem to be a history of immunity from suit at common law for privately held physicians working for the public, and the policy rationales that support qualified immunity are not so strong as to justify our ignoring this history, or lack of history."  693 F.3d 696, 698 (6th Cir. 2012).  In analyzing the underlying purposes of qualified immunity, the *McCullum* court, relying on *Richardson*, stated the timidity concern did not weigh in favor of expanding qualified immunity because market pressures and competition ward against a private actor's timidity. *McCullum*, 693 F.3d at 704.  The court explained that "a private firm's ability to offset any increased employee liability risk with higher pay or extra benefits" further vitiates any policy-

based concerns.  *Id.* (internal quotation marks omitted).  The court concluded that these policy factors, coupled with the lack of historical support for immunizing private physicians, would make extending immunity to private physicians inappropriate.[2]  *Id.*

The Eleventh Circuit, in *Hinson v. Edmond*, similarly held that a privately employed physician was not entitled to raise the defense of qualified immunity because neither history nor the underlying policy factors supported its extension in such a context.  192 F.3d 1342, 1345 (11th Cir. 1999), *amended*, 205 F.3d 1264 (11th Cir. 2000).  The *Hinson* court also relied on the effect that market pressures and competition have on privately run businesses.  In effect, if a private business, or those who it employs, are timid on the job, then a competitor can take advantage of that timidity and replace them.  Thus, "the market forces to which a private company is subjected negate the fears of unwarranted timidity" in its performance of duties.  *Id.* at 1346.  In *Jensen v. Lane County*, the Ninth Circuit held that qualified immunity is categorically unavailable to private physicians who contracted with the county to provide services in connection with temporary mental health detention.  222 F.3d 570 (9th Cir. 2000). The *Jensen* court also emphasized that neither history nor the underlying purposes for qualified immunity supported extending it to include privately employed healthcare workers.

By contrast, in *Perniciaro v. Lea* the Fifth Circuit held that the defense of qualified immunity *was* available to a private psychiatrist at a state-run mental health facility.  There, the court relied less on whether history supported extending immunity and instead focused on

---

[2] In *Lee v. Willey*, the Sixth Circuit again was presented with the issue of whether a private psychiatrist, who worked for the jail on a contract basis, was entitled to qualified immunity.  The court again declined to extend qualified immunity stating that there was "no good reason to disturb our holding in *McCullum*." *Lee v. Willey*, 543 F. App'x 503, 507 (6th Cir. 2013) (unpublished).

whether "the defendants' public counterparts would be able to assert qualified immunity."   901

F.3d 241, 252 (5th Cir. 2018).  The *Perniciaro* court distinguished the other circuit cases by

reasoning that because the private healthcare company at issue had not recently been replaced,

competitive forces and market pressure did not obviate the timidity concern.  *Id.* at 254.

Though the Tenth Circuit has no decisions on point, this district has declined to extend

qualified immunity to healthcare providers on numerous occasions.  *See Estate of Grubbs v.*

*Weld County Sheriff's Office*, No. 16-cv-00714-PAB-STV, 2017 WL 951149, at *5 (D. Colo.

Mar. 8 2017) (declining to extend qualified immunity to a privately employed healthcare

provider because the majority of "circuit courts to consider this question have rejected the notion

that medical professionals who work on behalf of jails have traditionally been afforded qualified

immunity."); *Carmody v. Ensminger*, No. 16-CV-02603-PAB-NYW, 2017 WL 4150601 (D.

Colo. Sept. 19, 2017) (holding that a privately employed nurse providing medical care to inmates

is not entitled to raise qualified immunity); *Est. of Stieb v. Johnson*, No. 16-CV-02548-KLM,

2018 WL 4111018, at *13 (D. Colo. Aug. 29, 2018) (relying on *Carmody* to similarly hold that

qualified immunity is unavailable to a privately employed nurse.).  In fact, in both *Grubbs* and

*Carmody* the private defendants asserting qualified immunity were CCS employees, like Ms.

Garrett.  Thus, both this district and the majority of circuits that have addressed the issue

conclude that private medical professionals working on behalf of the state are not entitled to

qualified immunity.

Defendant Garrett argues that she is entitled to qualified immunity because she was a

contract employee working on behalf of the government, while plaintiffs contend that qualified

immunity is categorically unavailable to her.  I agree with plaintiffs.  The majority of circuits and

several of this district's prior decisions support plaintiffs' position.  Although the Tenth Circuit

has not decided the issue, the Sixth Circuit, Ninth Circuit, and Eleventh Circuit have declined to

extend qualified immunity to privately employed medical providers who contract with the

government to care for inmates' health needs.  This district has also ruled the same way in nearly

identical contexts to the one here, when other CCS employees have sought qualified immunity.

The weight of authority is against defendant's position.

Rather than addressing the *Richardson* factors as other courts deciding the issue have

done, defendant relies on *Fallin*, a Tenth Circuit decision in which the court held that an

executioner was entitled to qualified immunity.  The *Fallin* court explained that "Dr. Doe is

entitled to assert qualified immunity because the purposes of qualified immunity supports its

application here: carrying out criminal penalties is unquestionably a traditional function of

government, exactly the sort of activities that *Richardson* reasoned qualified immunity was

meant to protect."  *The Est. of Lockett by & through Lockett v. Fallin*, 841 F.3d 1098, 1108 (10th

Cir. 2016).  Defendant urges this Court to apply the Court's reasoning in *Fallin* here.  However,

as the *Richardson* court made clear, determining whether private individuals are entitled to

qualified immunity is a fact-specific inquiry, and *Fallin* is distinguishable.  The impetus

underlying the *Fallin* decision was the executioner's role in carrying out the criminal penalty.

Overseeing the criminal system and carrying out criminal penalties have historically been

government functions, while providing individuals with healthcare have not been.   Here,

defendant Garrett was a licensed mental health professional whose duties involved evaluating

inmates' mental health.  She was not tasked with carrying out criminal penalties like the

defendant in *Fallin*. The Court thus finds defendant's reliance on *Fallin* misplaced. For the above reasons, the Court declines to extend qualified immunity to defendant Garrett.

### B. <u>Whether defendant was deliberately indifferent</u>

In their first claim for relief, plaintiffs assert that defendant Garrett was deliberately indifferent to Mr. Roundtree's serious medical needs when she cleared him from suicide watch and "disregarded the excessive risks associated with his known and obvious suicidality." ECF No. 87 at 21. According to plaintiff, defendant Garrett's deliberate indifference violated Mr. Roundtree's Fourteenth Amendment rights to be free from cruel and unusual punishment as a pretrial detainee. Defendant argues that summary judgment is appropriate on plaintiff's constitutional claim because the undisputed evidence demonstrates that no constitutional violation occurred.

The Eighth Amendment forbids subjecting those who have been convicted of crimes and are incarcerated to unnecessary and wanton inflictions of pain. *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000); *see also Estelle v. Gamble*, 429 U.S. 97, 103 (1976); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). While the Eighth Amendment's protections only apply to those convicted of crimes, these protections have been extended to pretrial detainees through the due process clause of the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, n.16 (citing *U.S. v. Lovett*, 328 U.S. 303, 317–18 (1946) ("Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."). When a plaintiff "finds himself in the criminal justice system . . . between the two stools of an initial seizure and post-conviction punishment, we turn to the due process clause . . . of the Fourteenth Amendment and [its] protection against arbitrary

government action by federal or state authorities to evaluate claims of mistreatment. *Colbruno v. Kessler*, 928 F.3d 1155, 1162 (10th Cir. 2019) (quoting *Porro v. Barnes*, 624 F.3d 1322, 1326 (10th Cir. 2010)).

Judicial interpretation of the Eighth Amendment has evolved over time to proscribe more than just physical torture. *Estelle*, 429 U.S. at 102. Instead, "it embodies broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Id.* This broader conception of the Eighth Amendment prohibits treating those who are incarcerated in ways incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958); *see also Estelle*, 429 U.S. at 102; *Farmer*, 511 U.S. at 834.

Incarcerated individuals are uniquely situated in that they must rely on others—namely, prison officials—to address their medical needs. *Sealock*, 218 F.3d at 1209; *see also Estelle*, 429 U.S. at 103 ("An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."). Therefore, a prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment because such indifference constitutes the "unnecessary and wanton infliction of pain." *Sealock*, 218 F.3d at 1210. Similarly, deliberate indifference to a pretrial detainee's serious medical needs violates the Fourteenth Amendment's due process clause.

The Tenth Circuit recognizes two theories of deliberate indifference. The first occurs when medical staff fails to adequately treat an individual's serious medical condition. *Perkins v. Kan. Dept of Corr.*, 165F.3d 803, 811 (10th Cir. 1999). The second occurs when prison officials, acting as gatekeepers, delay inmates' medical treatment by not permitting them access to medical professionals who can treat their condition. *Sealock*, 218 F.3d at 1211. It has long been

understood that both theories of deliberate indifference require a plaintiff to satisfy an objective and subjective component. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quoting *Sealock*, 218 F.3d at 1211).  The objective component requires evidence that the constitutional deprivation is sufficiently serious, while the subjective component requires evidence that the defendant acted with a culpable state of mind.  *Wilson v. Seiter*, 501 U.S. 294, 298–304 (1991).

      1. <u>*Kingsley* and whether the subjective component applies to plaintiffs' claims</u>

Although the objective and subjective components have historically been required in deliberate indifference claims, plaintiffs argue that the Supreme Court's decision in *Kingsley* vitiated the subjective component for claims brought by pretrial detainees.  The question is therefore whether plaintiffs' case is the type that requires proving both the subjective and objective components, or only the objective component.  Plaintiffs argue that this Court need only apply the objective component based on Mr. Roundtree's status as a pretrial detainee. Defendant Garrett does not address the issue.

In *Kingsley v. Hendrickson*, the Supreme Court held that a pretrial detainee alleging excessive force must only show that the force used against him was objectively unreasonable. 576 U.S. 389, 396–97 (2015).  According to the Court, "this determination must be made from the perspective of a reasonable officer on the scene, including what the officer knew at the time . . . ."  *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  The Tenth Circuit, relying on *Kingsley*, similarly stated that "there is no subjective element of an excessive force claim brought by a pretrial detainee."  *Colbruno v. Kessler*, 928 F.3d 1155, 1163 (10th Cir. 2019).

16

Plaintiffs urge this Court to extend the more relaxed *Kingsley* standard to a context beyond excessive force claims and hold that pretrial detainees are not required to prove the subjective component in deliberate indifference claims.  Plaintiffs contend that other circuits have applied logic similar to the Court's in *Kingsley* to remove the subjective component in *all* Fourteenth Amendment conditions-of-confinement claims.  ECF No. 87 at 21.  However, plaintiffs concede that the Tenth Circuit has not decided the issue.  Plaintiffs thus argue that in the absence of Tenth Circuit authority to the contrary, "the Court could properly decide that a subjective state-of-mind requirement is no longer applicable to Fourteenth Amendment denial of medical care claims."  *Id*. at 22.

The Court agrees that *Kingsley* eases the burden on pretrial detainees who allege excessive force claims under the Fourteenth Amendment.  However, the Court does not accept plaintiff's invitation to extend *Kingsley* to this context.  Because neither the Supreme Court nor the Tenth Circuit has extended Kingsley to the subjective component of a deliberate indifference claim, the Court will not do so here.  But, regardless, the Court finds that plaintiff has shown a genuine dispute of material fact as to the subjective component.

2. <u>Whether plaintiff has satisfied the objective component</u>

Because the Court declines to extend *Kingsley* to deliberate indifference claims, plaintiffs must prove both the objective and subjective components to survive summary judgment.  *Mata*, 427 F.3d at 751; *see also Farmer*, 511 U.S. at 825.  To satsify the objective component, plaintiffs must "produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'" *Mata*, 427 F.3d at 751.  A medical need is "sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person

would easily recognize the need for a doctor's attention." *Sealock*, 218 F.3d at 1209 (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)).  Death is "without doubt, sufficiently serious to meet the objective component necessary to implicate the Fourteenth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  The risk of sucide is also sufficiently serious.  *543* F. App'x 841, 846 (10th Cir. 2013) (unpublished) (a case in which defendants conceded, and the court agreed, that "the risk of, or potential for, suicide involves a sufficiently serious medical need and/or harm such that the objective prong of the Eighth Amendment is met.").

Here, Mr. Roundtree died as a result of his committing suicide by hanging merely hours after defendant Garrett ordered that he be removed from suicide watch.  The fact that Mr. Roundtree was at risk of committing suicide, and that he died as a result of suicide establish that the objective prong is met.  *Id.*  The Court therefore need not belabor the objective component analysis.

### 3. Whether plaintiff has satisfied the subjective component

Defendant Garrett next argues that the undisputed evidence demonstrates that there is no genuine dispute of fact as to whether plaintiffs have satisfied the subjective component. Although plaintiffs contend they need only prove the objective component under *Kingsley*, in the alternative they argue that they have satisfied their burden under the subjective component.  I agree.

Under the subjective component, plaintiffs must demonstrate that the prison official had a "sufficiently culpable state of mind" when she denied or delayed the inmate's medical treatment. *Oxendine v. Kaplan*, 241 F.3d 1272, 1274 (10th Cir. 2001).  The subjective standard requires a

state of mind "akin to recklessness in the criminal law, where, to act recklessly, a person must consciously disregard a substantial risk of serious harm."  *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (quoting *Farmer*, 511 U.S. at 837).  Plaintiffs can satisfy the subjective component if they prove that the prison official had knowledge of an excessive risk to inmate health or safety and disregarded that risk.  *Mata*, 427 F.3d at 752.  "The official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and [the official] must also draw that inference."  *Farmer*, 511 U.S. at 837.  However, an "inadvertent failure to provide adequate medical care does not rise to a constitutional violation." *Martinez*, 563 F.3d at 1088. (quoting *Estelle*, 429 U.S. at 105–06).

While plaintiffs bear the burden of demonstrating that prison officials had a sufficiently culpable state of mind, there is no requirement that defendants have "the express intent to harm" the victim of the alleged indifference.  *Mitchell v. Maynard*, 80 F.3d 1433, 1442 (10th Cir. 1996).  Further, plaintiffs are not required to "show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite [her] knowledge of a substantial risk of harm."  *Farmer*, 511 U.S. at 842. Determining whether a defendant possessed actual knowledge of the substantial risk of harm is a question of fact and can be proven in the usual ways, including by circumstantial evidence.  *Id.*

Defendant argues that no reasonable jury could find that Ms. Garrett had knowledge that there was a substantial risk that Mr. Roundtree would commit suicide, nor that she disregarded any such risk.  I disagree.  Numerous factual disputes exist that could lead a reasonable jury to find both that Ms. Garrett had acknowledge knowledge of a substantial risk of harm, and that she disregarded that risk.

Defendant contends there is no conclusive way to know someone is going to commit suicide. However, plaintiffs have presented evidence that demonstrates there are certain risk factors under the Columbia Scale that professionals, including Ms. Garrett, consider when determining a person's potential suicidality. Ms. Garrett was trained on these risk factors, and the CCS risk assessment form required Ms. Garrett to analyze these factors. ECF No. 87-3 at 114:13-15; *see* ECF No. 87-21. In addition to the risk factors, there are high-risk times where a person is more likely to feel suicidal. These include when an individual is admitted to jail, awaiting a court hearing, or after negative court outcomes. ECF No. 113:4–11. Ms. Garrett acknowledges that she "had to look at all of the risk factors," high-risk times, and the person's behavior when conducting a suicide watch assessment. ECF Nos. 87-3 at 61:25–62:1, 113:4-11, 117:11-17.

Despite her familiarity with these risk factors—and their appearing on the suicide assessment form that Ms. Garrett completed—plaintiffs have produced evidence that Ms. Garrett did not check all of the factors applicable to Mr. Roundtree. For instance, Ms. Garrett admitted that she knew Mr. Roundtree was prescribed Citalopram, and that he was not currently taking it. *Id.* at 179. Ms. Garrett did not include this information on the form. ECF No. 87-21. Further, despite Mr. Roundtree's telling her of his recent suicide attempt—when he consciously drove his car at sixty miles per hour into another vehicle—Ms. Garrett did not check the "impulsive" risk factor, nor did she check the "major depressive/manic episode" risk factor. *Id*. at 4. Additionally, Ms. Garrett did not check that he was facing "new legal issues" despite him being arrested less than twenty-four hours earlier. *Id.* Thus, defendant Garrett had actual knowledge of several risk factors that could lead a reasonable jury to conclude that Mr. Roundtree was at a

substantial risk of committing suicide.  Additionally, defendant Garrett's failure to mark several risk factors that were relevant to Mr. Roundtree's circumstances could lead a reasonable jury to conclude that she disregarded that risk.

Plaintiffs have also presented evidence that Mr. Roundtree's suicidality was "so obvious that even a lay person would easily recognize the need for a doctor's attention." *Sealock*, 218 F.3d at 1209 (quoting *Hunt*, 199 F.3d at 1224).  Plaintiffs have demonstrated that three separate individuals were concerned that Mr. Roundtree was at a serious risk of harming himself. Investigator True, who interviewed Mr. Roundtree for hours, concluded that he was suicidal based on his statements and demeanor throughout the interview.  Additionally, at his advisement hearing both the deputy district attorney and the judge expressed serious concerns about Mr. Roundtree's suicidality.  The judge increased his bond and stated that jail was the best place to keep Mr. Roundtree safe from himself.  Each of these facts could lead a reasonable jury to conclude that Mr. Roundtree's suicidality was sufficiently obvious that defendant Garrett had actual knowledge of it.

Plaintiffs have also established that CCS policy classified someone who "has a documented suicide attempt in the past 12 months" as a high-risk patient.  ECF No. 87:3 at 165:13-18.  Defendants contend that this category only applied to suicide attempts that were documented by external records.  Here, defendant Garrett states that she did not classify Mr. Roundtree as high risk because his three-month-old suicide attempt was not documented by external records—it was only self-reported.  But even if she was not *required* by CCS to classify Mr. Roundtree as high risk, defendant Garrett's training indicates that she knew Mr. Roundtree's recent suicide attempt created a considerable likelihood of another attempt.  Based on the notes

in her assessment, she not only knew that Mr. Roundtree had previously attempted suicide, she knew that he had sustained serious injuries in his attempt.  On the assessment form, Ms. Garrett wrote that Mr. Roundtree "states he has one previous [suicide attempt]—October 6, 2017 he drove a car 60 mph into a parked car while drunk.  He states he was in ICU for five days; fractured his skull, broke his face, and has fused vertebrae."  ECF No. 87-21 at 2.  Thus, a reasonable jury could find that Ms. Garrett consciously disregarded a known risk of harm by failing to keep Mr. Roundtree on suicide watch merely because she did not yet have external documents corroborating Mr. Roundtree's self-reported suicide attempt.

A genuine dispute also exists as to whether the length of the suicide watch assessment was sufficient.  Defendant has presented evidence, in the form of expert and CCS employee testimony, that Ms. Garrett's five-minute assessment of Mr. Roundtree was sufficient and thorough.  Plaintiffs have introduced evidence that it was not, and that Ms. Garrett ignored risk factors that were applicable to Mr. Roundtree's case, including his impulsivity, manic/depressive disorders, being recently admitted to a jail, impending court date, and dealing with serious charges.  The length of the assessment coupled with a less than thorough assessment form support the inference that the five-minute assessment was insufficient.  Thus, a reasonable jury could find that defendant Garrett consciously disregarded the known risk of harm when she failed to (1) meet with Mr. Roundtree for more than five minutes, and (2) carefully consider each of the applicable risk factors.

Finally, a genuine dispute exists as to whether Ms. Garrett consciously disregarded a serious risk of harm when she relied on Mr. Roundtree's assurances that he was not suicidal, and did not follow up with other individuals who had information about Mr. Roundtree's mental

state.  Less than twenty-four hours before Ms. Garrett removed Mr. Roundtree from suicide watch, Investigator True requested that he be placed on suicide watch due to concerning statements he made.  While Ms. Garrett stated that she did not know which investigator or deputy placed Mr. Roundtree on suicide watch, she did know he was placed on suicide watch because police were concerned that he wanted to die "suicide by cop."  *See* ECF No. 87-21. Additionally, CCS policy states that "[m]ental health information shall be communicated between the licensed mental health professional, psychiatrist, medical staff, classification staff, and correctional staff."  ECF No. 87-19 at 5.  Ms. Garrett admits she knew about Mr. Roundtree's supposed statement, and that such a statement "qualified as a statement of suicidal ideation."  ECF No. 83-8 at 173.  Despite her conceding that mental health professionals cannot take an inmate's words at face value during a suicide watch assessment, she did just that with regard to Mr. Roundtree's suicidal comments.  ECF No. 87-3 at 60:23-25.  She did not try to discover which deputy placed him on suicide watch or their reasons for doing so prior to her releasing Mr. Roundtree to general population.  A reasonable jury could find that defendant Garrett consciously disregarded a serious risk of harm when she simply accepted Mr. Roundtree's denials of suicidal ideation as true, rather than following up with individuals who spent more time with him and expressed concerns that he may commit suicide.

The Court finds that the above factual disputes could lead a jury to reasonably conclude that Ms. Garrett was deliberately indifferent to Mr. Roundtree's serious medical needs. Summary judgment is therefore inappropriate based on the evidence before the Court. Defendant Garrett's motion for partial summary judgment is DENIED.

### ORDER

Defendant Garrett's motion for partial summary judgment, ECF No. 83, is DENIED.

DATED this 16th day of March, 2021.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge